OPINION OF THE COURT
Jasen, J.
In 1950 the Association of Contracting Plumbers of the City of New York and Local Union No. 2 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada (union) entered into a collective bargaining agreement. The agreement established the Joint Plumbing Industry Board which was to administer a Pension and Welfare Fund (fund) in accordance with applicable Federal law,[1] the revenues of which were to be derived from employer contributions.
*43 The fund was formally created in 1952 by an agreement and declaration of trust (trust agreement) for the benefit of journeymen plumbers and apprentices. The trust agreement contained the usual provisions with respect to the investment and fiscal management of the assets of the fund and conferred on the trustees "power to make, amend and repeal such rules and regulations, not inconsistent with the terms thereof, as they may deem necessary or proper to carry out the provisions of this Agreement”. Exercising this power, the trustees promulgated "The Plumbing Industry Pension Fund, Rules and Regulations for Pension Plan” (plan) which prescribed the following eligibility requirements for fund benefits: (a) attainment of age 65; (b) 15 years’ union membership, from 1939, five consecutive years of which immediately precede the date of application for retirement; (c) 1,250 days’ employment at the plumbing trade; and (d) employment of any duration with a contributing employer in each of the two years directly preceding the date of application for retirement.
A 1960 amendment to the pension plan provided eligibility for disabled employees after age 50, and in 1963 the plan was further amended to delete union membership as a condition of eligibility. Instead, employment with a contributing employer, regardless of union membership, qualified one for fund benefits.
In 1966 the pension plan was again amended to provide for early retirement at age 60. Additionally, benefit claimants were now required to have accumulated 15 consecutive years of employment and 1,250 working days with a contributing employer immediately preceding the application for benefits. This amendment, adopted by the trustees in the exercise of their power to amend the plan,[2] gave rise to the present litigation.
Respondent Max Mitzner, born July 15, 1904, entered the plumbing trade in 1922 and joined the union at its inception in 1939. He labored in this trade during his entire working life, except that a one-year hiatus occurred in 1961 during which he was employed by Intercity Plumbing and Heating, a corporation in which he owned stock, as an officer.
*44 Based on a physical disability, respondent, at age 62, applied for early retirement pension benefits on November 17, 1966. Informing respondent that he had not satisfied the 1,250 day employment requirement, the board of trustees in a letter dated February 17, 1967, disapproved the application. This rejection prompted respondent to resume employment with contributing employers through 1968 when he had amassed the requisite number of days.
During this period, respondent repeatedly communicated with the board of trustees concerning his eligibility for pension benefits. Finally, on October 15, 1969, the respondent, accompanied by his attorney, attended a meeting of the board at which the application was reviewed and rejected because respondent had not complied with the 15-year requirement of continuous employment, the "break in service” having occurred in 1961 when respondent had been an officer for Intercity Plumbing and Heating Corporation.
The principal issue posed in this case is whether the 1966 amendment, requiring 15 years continuous employment with contributing employers immediately prior to retirement was arbitrarily and capriciously applied by the fund’s trustees to deprive respondent of pension benefits. We hold, under the circumstances here presented, that the trustees did arbitrarily apply the 1966 amendment and, therefore, that respondent’s application for pension benefits should have been approved.
The law governing the administration of pensions is a hybrid born of a marriage of contract and trust principles. Over the years both fields of law have vied for the dominant role. At first, courts fastened on the contractual nature of pensions. Because pensions presumably represented nothing more than agreements between employees or their unions and employers, an overwhelming demonstration of an improper denial of benefits was required before trustees would be judicially compelled to provide pension benefits to rejected applicants. (Menke v Thompson, 140 F2d 786.) Later cases, however, have accorded increasing weight to the fiduciary obligations borne by the trustees for the benefit of the employees. (Lee v Nesbitt, 453 F2d 1309; Norton v I. A. M. Nat. Pension Fund, 553 F2d 1352.) Even where the trustees are vested, by the terms of the trust indenture, with sole authority on matters relating to employees’ rights to receive pension benefits, a denial of benefits will be judicially set aside if the "board’s ruling was motivated by bad faith, or arrived at by *45 fraud or arbitrary action.” (Gitelson v Du Pont, 17 NY2d 46, 49; Smith v Stewart, 45 AD2d 853, affd 38 NY2d 747; Connell v United States Steel Corp., 516 F2d 401.)
This gradual shift in emphasis derives from the burgeoning role served by pension plans in our society[3] and from the growing awareness that potential recipients are all too often deprived of the benefits on which they had relied for security during retirement. Regrettably, "the degree of retirement protection in private pension plans varies widely and in many cases remains quite inadequate.” (President’s Committee on Corporate Pension Funds and Other Private Retirement and Welfare Programs, Public Policy and Private Pension Programs: A Report to the President on Private Employee Retirement Plans, Jan., 1965, p 39.) To avert potential tragedies, the House Committee on Education and Labor expressed support for the view that pension trustees be impressed with the highest standard of fiduciary duty. (1974 US Code Cong and Admin News, p 4659.)
But it is not enough merely to declare that such trustees are charged with the most unremitting fiduciary standards, for the nature of their duty, to preserve the trust fund and to provide benefits for retired employees, is twofold (Lamb v Carey, 498 F2d 789, cert den sub nom. Carey v Davis, 419 US 869) and the demands of the two interests which they must so scrupulously protect may at times pinion them between irreconcilably opposite duties. Thus, although trustees may not arbitrarily and capriciously deny benefits (Roark v Lewis, 401 F2d 425; Pasternack v. Diamond, 3 AD2d 422, affd 5 NY2d 770), their actions must be measured by balancing the duty owed to the retired members — to provide benefits — against the duty owed to the fund — to safeguard it from depletion for the benefit of active members who will apply for benefits in the future.[4] (Roark v Boyle, 439 F2d 497.)
*46 The conflict between these fiduciary obligations is often encountered where entitlement to trust funds is conditioned on a specified period of continuous employment. Such a requirement deprives applicants who experienced a "break-in-service” before qualifying for a pension from receiving pension benefits. Harsh results brought by such rules impelled the House Committee on Education and Labor to condemn break-in-service provisions: "Despite the recognized and acknowledged need for pension plans to provide for vesting of earned benefits * * * [t]he difficulties and hardships resulting from non-existent or inadequate plan provisions for vesting of benefits have been vividly established”. (1974 US Code Cong and Admin News, p 4644.) Recognizing that break-in-service rules may preserve pension funds from financial ruin, we do not hold such rules arbitrary per se.[5] (Pasternack v Diamond, 3 AD2d 422, affd 5 NY2d 770, supra; Burroughs v Board of Trustees, 542 F2d 1128, cert den 429 US 1096; Giler v Board of Trustees, 509 F2d 848; Gaydosh v Lewis, 410 F2d 262.) However, even where reasonable on its face, a break-in-service rule might nevertheless be arbitrarily, and thus improperly, applied. (Connell v United States Steel Corp., 516 F2d 401, supra; Lee v Nesbitt, 453 F2d 1309, supra.) One factor tending to indicate arbitrariness is where a rule is retroactively applied to deny benefits, or where an applicant is not given notice of changes in eligibility requirements. (Burroughs v Board of Trustees, 542 F2d 1128, cert den 429 US 1096, supra; Wilson v Board of Trustees, 564 F2d 1299.)
Turning to the case before us, we conclude that the trustees withheld benefits from respondent arbitrarily. Respondent had worked in the plumbing trade from 1922 until 1968, and he was clearly an intended beneficiary of the trust fund. Because of a break-in-service in 1961, a retroactively applied amendment to the trust agreement stripped him of credit for 21 years of service dating from 1939, the year he joined the newly created union. Moreover, respondent was not informed of the break-in-service rule until 1968, two years *47 after the rule had been promulgated, and two years after he had initially applied for early retirement benefits. Such a showing by respondent satisfied his prima facie burden of proof that his application had been arbitrarily denied (Gitelson v Du Pont, 17 NY2d 46, supra), and the Appellate Division was therefore correct in remanding the case to Supreme Court for a hearing to afford the trustees the opportunity to rebut.
On remand, it was established that prior to the 1966 amendment one could qualify for a full pension, having worked for contributing employers for only a very brief period. The purpose of the 1966 amendment was to prevent such occurrences. Because the express purpose of the 1966 amendment was to preserve the fund from invasion by claimants manifestly undeserving of its benefits, and because the amendment advanced this purpose, it is reasonable on its face. (Sarnow v Moving Picture Mach. Operators’ Union, 24 NY2d 505.)
However, on the record now before us, we can only conclude that, in retroactively applying this rule to this respondent, who had worked for contributing employers for many years, the trustees acted unreasonably. It must be noted in this regard that no showing was made that sound actuarial practice required that this claimant be denied benefits, nor was there evidence that the amendment was adopted to avert pending financial distress. Where an otherwise valid rule, which serves to safeguard a pension fund from depletion, is used as a scythe to raze claims which stand well beyond the compass of the rule’s avowed purpose, the law must halt the blade’s reckless sweep.
Appellants raise the additional contention that respondent is not entitled to the retirement benefits sought because no formal application was ever filed for such benefits, the only application ever made by respondent having been for early retirement benefits. Not only do we find no merit in this argument, but we note how uncommendable these fiduciaries act in contriving to shirk their responsibilities by advancing so vapid a contention. The application originally filed by respondent for early retirement benefits is titled "APPLICATION FOR PENSION”. After respondent reached 65, the age of regular retirement, this application was reconsidered and rejected. Respondent was never advised that a separate application was required for regular retirement benefits, nor does any rule of the pension plan so state. Under such circum *48 stances, a manifest injustice would result if this application were not now deemed one for regular retirement benefits.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Breitel and Judges Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order affirmed.

. (Taft-Hartley Act, US Code, tit 29, § 186, subd [c], par [5].)

. To the extent that these were amendments to the plan itself, there is a factual difference from those cases in which trustees have unilaterally exercised an administrative authority conferred on them in the plan to make rules and determinations to carry out the provisions of the particular plan.

. According to House Report No. 93-533, in 1940 approximately 4 million workers were covered by private pension plans. By 1960 this number had soared to over 21 million, and by 1976 to over 30 million, nearly half the nonfarm labor force.

. Congress, aware of the inequities that have deprived workers of pension benefits, enacted the Employee Retirement Income Security Act (ERISA) (US Code, tit 29, § 1001 et seq.) in 1974, which acknowledges the conflicting fiduciary obligations imposed on pension trustees. (ERISA was not given retroactive application [US Code, tit 29, § 1061, subd (a)].)
"[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
"(A) for the exclusive purpose of:
"(i) providing benefits to participants and their beneficiaries; and *46 "(ii) defraying reasonable expenses of administering the plan:
"(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims”. (US Code, tit 29, § 1104.)

. Congress has established strict minimum vesting standards which preclude the harsh results wrought by break-in-service rules. (US Code, tit 29, § 1053.).